| | | |
|---|---|---|
| JOHN FIX, | ) | |
| | ) | **Case No. 21-cv-02843** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Judge Sharon Johnson Coleman** |
| | ) | **Magistrate Judge Fuentes** |
| CITY OF CHICAGO, Former | ) | |
| Chicago Police Officer MICHAEL | ) | |
| SEISER #4615, Chicago Police | ) | |
| Officers REGINALD FOSTER | ) | |
| #5943, BOJAN SIMIC #12847, | ) | |
| RICHARD BANKUS #6769, | ) | |
| BRANDON NEITA-SCOTT #18908, | ) | |
| SERGEANT SHANNON MARTIN | ) | |
| #2585, and Unknown Chicago | ) | **JURY TRIAL DEMANDED** |
| Chicago Police Officers, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

NOW COMES Plaintiff, JOHN FIX, by and through his attorneys, BREEN & PUGH and STEVEN H. FINE, complaining of the CITY OF CHICAGO, Former Chicago Police Officer MICHAEL SEISER, Chicago Police Officers REGINALD FOSTER, BOJAN SIMIC, RICHARD BANKUS, BRANDON NEITA-SCOTT, SERGEANT SHANNON MARTIN, and Unknown Chicago Police Officers (collectively "Defendants"), and alleges as follows:

### Introduction

1.     On the evening of May 31, 2020, at the corner of Hubbard and Clark Streets in Chicago's River North neighborhood, Plaintiff John Fix was brutally assaulted and beaten with batons by on-duty Chicago police officers in broad

daylight while being filmed by citizens, the news media, and by surveillance cameras from a local business. The Chicago police officers involved in this case knew that their actions would not land them in any trouble and, as such, they openly and wantonly beat Plaintiff in public on video.

2.      Former Chicago Police Officer Michael Seiser repeatedly beat Plaintiff about the head and body with his police baton while Plaintiff was lying helpless on the ground. Other officers, including Officers Foster, Simic, and Neita-Scott, participated in the assault against Plaintiff, holding him on the ground, while Officer Foster beat Plaintiff repeatedly on his legs with a baton. Chicago Police Sergeant Martin, Former Chicago Police Officer Michael Seiser, and other Chicago police officers, including Officer Reginald Foster, falsely arrested Plaintiff.

3.      Despite doing nothing wrong or unlawful, the officers who brazenly beat Plaintiff then arrested him, ultimately charging him with an offense that was dismissed in court. As a result of Defendants' conduct, Plaintiff suffered severe injuries, which included injuries to his head, a concussion, contusions and lacerations to his body, and emotional trauma.

## Jurisdiction and Venue

4.      This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's constitutional rights as secured by the United States Constitution.

5.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367 as Plaintiff asserts claims under federal law and his state law claims

all arise out of the same facts as his federal claims.

6. Venue is appropriate in this Court under 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims occurred in this District, and because at least one of the Defendants resides in this District.

## Parties

7. Plaintiff JOHN FIX is twenty-one (21) years old. He resides in Chicago, Illinois and is a United States citizen.

8. Defendants were, at all relevant times, employed by the City of Chicago as sworn police officers. All of the Chicago Police Officers are sued in their individual capacities.

9. Defendant City of Chicago is a municipal corporation of the State of Illinois and is and was, at all relevant times, the officer defendants' employer. The City of Chicago maintains, manages and/or operates the Chicago Police Department.

## Facts

10. In the wake of the police killings of George Floyd, Breonna Taylor, and countless others, residents of the City of Chicago took to the streets to peacefully protest in downtown Chicago over the weekend of May 29-31, 2020.

11. Officers from the Chicago Police Department responded to the protests with brutal force, violence, and unconstitutional tactics intended to injure and silence protestors lifting their voices against police violence.

12.     On the evening of May 31, 2020, at approximately 8:00 p.m., Plaintiff joined a peaceful protest he encountered in the River North neighborhood of Chicago's downtown area. Plaintiff joined the march to express his opinion that the police must be held accountable to the communities they serve and to express his support for victims of police violence.

13.     When Plaintiff reached an area just south of the Hubbard and Clark intersection he observed a man lying on the sidewalk and surrounded by police. As Plaintiff attempted to assist the man, police used their bikes to push him and others away from the area. Additional officers arrived on the scene dressed in full riot gear, armed with pepper spray and riot batons.

14.     After the arrival of these additional officers in riot gear, officers became increasingly aggressive toward the crowd and Plaintiff. Chicago police officers, including Defendants, shoved Plaintiff and knocked him to the ground.

15.     During the beating, Defendants struck Plaintiff repeatedly about his head and body, struck him with riot batons, and continued to hit him while he was collapsed on the ground and in a prone position.

16.     The unjustified beating continued while Plaintiff screamed for help. At times, multiple assaulting officers beat Plaintiff simultaneously.

17.     Additionally, police officers took Plaintiff's backpack, necklace, and smashed his cell phone with batons. Defendants never returned Plaintiff's property to him.

18.     Below are images of Defendants' beating of Plaintiff with batons:





19.     Throughout the ordeal, Plaintiff did not struggle or resist Defendants in any way. Plaintiff repeatedly begged Defendants to stop and asked Defendants why they were beating him, but the officers refused to answer. The beating continued while other officers watched this occur to Plaintiff without intervening or rendering aid.

20.     Plaintiff was subsequently handcuffed, detained in the back of a police vehicle, and ultimately charged with disorderly conduct. The arresting officers did not make any observations that would lead a reasonable officer to believe Plaintiff committed an offense. The prosecutor subsequently dismissed the criminal offense.

21.     As a result of the attack, Plaintiff has sustained severe physical injuries, including a traumatic head injury, head laceration, bruised ribs, and severe leg pain. Although Plaintiff suffered a visible injury to his head, officers failed to provide any medical treatment. Below are images of some of Plaintiff's injuries caused by Defendants:



22.     Also, as a result of the attack, Plaintiff sustained severe emotional injuries including, but not limited to, fear of additional attacks, fear of retaliation by the officers, fear of other members of the Chicago Police Department, humiliation, and other emotional injuries.

23.     Security cameras from a business located at the southwest corner of Hubbard and Clark captured much of the attack on videotape. The Chicago Police Department had access to the tape and several witnesses within days of the beating.

24.     On information and belief, not one of Defendants reported any of the other assaulting officers' misconduct. Furthermore, non-assaulting officers failed to report any of Defendants' misconduct.

25.     While this incident was reported to the City of Chicago Civilian Office of Police Accountability ("COPA"), COPA has utterly failed to maintain communication with Plaintiff.

26.     As a result of the deficient investigation of Defendant officers' conduct by the City of Chicago, the complaints and evidence related to Plaintiff's beating were improperly and insufficiently addressed and/or allowed to occur without consequence.

27.     The Chicago City Council has long been aware of the disciplinary failures of the Chicago Police Department. At an October 2007 City Council meeting, a Council member remarked of the Office of Professional Standards ("OPS") that "there is no follow-up [of citizen complaints], and that I think we have

to move beyond the code of silence and the protection of the police officers and command staff at any cost." Although the City has long been aware that its supervision, training, and discipline of police officers are entirely inadequate, it has not enacted any meaningful measure to address that failure.

28.     From 2001-2006, only 0.2% of complaints against officers were meaningfully sustained (resulting in a week or more suspension), with 662 officers having 11 or more complaints against them. A brutality complaint was 94% less likely to be sustained in Chicago than in the rest of the nation.

29.     In 2007, and in response to growing issues surrounding police accountability in Chicago, the City Council enacted an ordinance to replace OPS with a civilian-run agency called the Independent Police Review Authority ("IPRA").

30.     OPS investigators simply became IPRA investigators. For years, IPRA used the OPS manual as its operational manual.

31.     Like OPS, IPRA served to protect police officers. It failed to fairly and impartially investigate citizen complaints, and it failed to promote its stated purpose of transparency and police accountability.

32.     Currently, the Civilian Office of Police Accountability is tasked with investigating improper use of force allegations against Chicago Police officers.

33.     As a direct result of the City of Chicago's failure to properly investigate claims of police brutality and misconduct, a code of silence and/or "blue shield" exists within the police department, wherein officers cover up the misconduct of

their fellow officers, allowing officers to act with impunity and to believe their acts of misconduct will not be properly investigated and will go unpunished.

34.     The Chicago Police Department has a long history of covering up its officers' misconduct. Defendant City of Chicago has been aware of this widespread custom and practice for many years.

35.     In the case of *Klipfel v. City of Chicago*, et. al., 94 C 6415, former Chicago Police Department Superintendent Kline testified at his deposition that a code of silence exists within the department.

36.     On December 9, 2015, former Mayor Rahm Emanuel acknowledged that a code of silence exists and has long existed within the Chicago Police Department. Mayor Emanuel stated that this tendency to ignore, deny, or cover up police officers' bad actions leads to a culture where extreme acts of abuse are more likely. A task force was created to investigate both CPD and IPRA. Mayor Lightfoot headed the task force, and it was called the "Police Accountability Task Force" (PATF). The PATF concluded that a code of silence exists within the Chicago Police Department. The task force found the code of silence is "institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between various police unions and the City." In December 2016, the President of the officers' unit in Chicago admitted that there is a "code of silence" in the Chicago Police Department. The same code of silence and ineffective system of police oversight were in place when Plaintiff's constitutional rights were violated.

37.     Additionally, the task force found that IPRA "investigations are riddled with structural, cultural and procedural problems that cast doubt on the investigating agencies' intentions and integrity and larger oversight system. Misconduct goes uninvestigated despite the availability of information about these incidents; unreasonable and unjustified procedures hamper investigations, and the investigative agencies lack the resources and support to be effective and show troubling signs of bias."

38.     The United States Department of Justice (DOJ) investigated the Chicago Police Department and released a report with its findings in January 2017. The DOJ concluded the following:

a.      Deficiencies in CPD's training, supervision, accountability, and other systems had contributed to a pattern and practice of excessive force;

b.      The CPD failed to review its force practices as a whole to identify problematic trends and patters that endangered the officers and the community; and

c.      The CPD failed to provide its officers with adequate guidance to understand how and when they may use force or how to safely and effectively control and resolve encounters to reduce the need to use force.

39.     The DOJ report concluded that IPRA did not properly investigate allegations of police misconduct. For instance, the DOJ report found that IPRA sustained fewer than 2% of the 30,000 police misconduct complaints Defendant City received from 2011 to 2016.

40.    The DOJ report became the basis of legal action against the Defendant City by the Illinois Attorney General's Office. In January 2019, Defendant City entered into a court-approved consent decree designed to reform the Chicago Police Department.

41.    An Independent Monitoring Team (IMT), overseen by Judge Robert M. Dow, Jr., assesses the City and CPD's compliance with the Consent Decree in biannual reports. In the first report, the City and CPD failed to meet even preliminary compliance standards for 52 of 67 paragraphs of the Consent Decree. The City and CPD missed 37 of 50 deadlines. The second report was no better. In that report, filed June 18, 2020, the City and CPD missed 52 of 74 deadlines. The City's failure to comply with standards resulted in the plaintiff's injuries as alleged in this case.

42.    CPD continues to fail at reforming its unconstitutional practices and the City of Chicago continues to be deliberately indifferent to its failures.

43.    The code of silence operates in cases like this to shield and protect Defendants, or to lessen the consequences to them by shaping the narrative in their favor. The non-assaulting officers participate in the code of silence by explicitly or implicitly agreeing to adopt a false narrative, or to conceal facts and evidence harmful to their fellow officers, in order to help them.

44.    In fact, in this case, despite instances of sustained police misconduct by Defendants, the City permitted Defendants to remain on the street and continue a pattern of abuse against residents of Chicago like Plaintiff.

45.     The historical failures by the City of Chicago to properly investigate allegations of excessive force by its members; its long history of failing to discipline its officers for improper use of force; its failure to investigate or punish officers who participate in the code of silence to protect and conceal the misconduct of fellow officers have all contributed to the continued uses of excessive force and the continued existence of the code of silence in the Chicago Police Department and in the City's agencies. These failures by the City have encouraged officers in their belief that they can engage in misconduct, or they can help to conceal it without any consequences.

46.     The City of Chicago Police Department has inflicted beatings on protestors, arrested protestors without probable cause-unlawfully depriving them of their freedom in retaliation for protest activities.

47.     The police departments' violent protest-related policies and practices were documented in 1855 and have continued for over a century.

48.     The police response to the 1960's Black Freedom Movement with violent and repressive tactics. The police use of tear gas on protestors was prelude to more aggressive action. Mayor Richard J. Daley ordered police to shoot to kill arsonists and shoot to maim and cripple anyone suspected of involvement in property-related crimes.

49.     The police violence against protestors continued during the Democratic National Convention. Chicago police officers used tear gas against a large crowd of protestors outside a hotel. Police used similar techniques to trap protestors in

certain parts of the city before deploying tear gas against the protestors. Several protestors were attacked and beaten with police riot batons. Over 500 protestors and multiple civilians reported injuries due to the police officers' actions.

50.     The anti-war protests in Chicago and the City's response prompted the federal government to create a commission to investigate and make recommendations regarding the protests.

51.     The 1968 Commission compared the CPD to the police departments responding to protest elsewhere in the country. The finding concluded that "in Chicago the authorities were restrictive in granting demonstration permits, some of the police, deliberately goaded by verbal and physical attacks of small militant groups, responded with excessive force not only against the provocateurs, but also against peaceful demonstrators and passive population against the authorities and in favor of the demonstrators."

52.     The Commission also detailed how CPD "without coherent planning…clubbed and tear gassed guilty and innocent alike, chasing demonstrators through the streets….bystanders who had taken no part in the demonstrations were attacked by police officers." The commission further found that CPD responded to the protests with "unrestrained and indiscriminate violence on many occasions," often inflicted upon "peaceful demonstrators, onlookers, and large numbers of residents who were simply passing through, or happened to live in, the areas where confrontations were occurring."

53.     CPD's violence against protestors continued into the 1990s. On April 10, 1990, protestors gathered to protest the firing of a school principal. CPD officers screamed racial slurs at the protestors and used brutal force against them. As a result of the brutal use of force by officers, 14 people required medical treatment.

54.     The police response to a protest on April 23, 1990, resulted in several protestors being falsely arrested and others sustained multiple injuries. Police beat protestors by pushing, shoving, and throwing protestors to the ground.

55.     On December 29, 1990, protestors gathered in protest of the Gulf War. Chicago police officers were observed striking protestors in the case, placing them in choke-holds, and conducting false arrests.

56.     On June 24, 1991, Chicago police officers used force against a group of protestors gathered at a medical convention. One officer was seen throwing a protestor onto the pavement, punching the protestor in the face, and falsely arresting the protestor.

57.     In August of 1996, several protestors were beaten and falsely arrested by police officers. A number of protestors filed suit against the City and the officers based on excessive force and false arrest. The City of Chicago settled the lawsuit.

58.     On March 20, 2003, Chicago police officers trapped over 800 protestors on Chicago Avenue without giving them orders to disperse and an opportunity to leave. The officers were wearing riot gear and holding batons. The police then arrested over 500 people. The remaining people were allowed to leave, but only after they left behind their banners, signs, and other property, and walk in a single file

line with their hands raised in the air past the officers. Some protestors had their bags searched by officers. The police also used force when they stormed the crowd and struck people with riot batons. The officers' actions were done with consent and approval of the Superintendent of Chicago Police.

59.     A federal lawsuit was filed against the City of Chicago, Superintendent Hillard, and other CPD officers alleging various constitutional violations, and municipal liability under *Monell*. Additional claims of excessive force, battery, and denial of medical care were brought on behalf of some plaintiffs. The case was settled for approximately $15 million. The day of the settlement CPD Superintendent McCarthy stated that the case involved "important lessons" about dealing with large groups of protestors, including the need to provide individuals with orders to disperse and opportunities to leave.

60.     In 2011, police used excessive force against legal observers as they attempted to assist a young woman and child that had been battered by CPD during an anti-deportation protest.

61.     On March 11, 2016, police used batons and force to push anti-Trump protestors. Several protestors were physically attacked and four were falsely arrested during the protest. In one instance, a woman was grabbed by the hair and thrown to the ground by an officer. The officer then kicked the woman on her body and beat her multiple times on her head and body with batons. She was struck in the head with a baton causing blood to drip down her face. Another individual was

grabbed from behind and threw to the ground. An officer then placed his boot on the individual's neck while conducting the arrest.

62.     In 2015, the Department of Justice documented the racist, biased, and anti-protestor views held by many officers who often express discriminatory views on social media. The DOJ found that supervisors posted many of the posts if reviewed.

63.     Second City Cop, a popular police blog, contained content: "I have already canceled my monthly subscription to a supplement company due to their Social Justice Warrior-Virtue Signaling-BLM Pandering email they felt compelled to send me to illustrate their 'woke-ness.' It's time to start using these Communists rules of engagement them. I purchased a product for the product, not to receive political rhetoric about the values of BLM (founded by two Black female Marxists). No thanks! I'll spend my money with companies not afraid to speak the truth, if there are any left."

64.     Second City Cop contains a volume of content demonstrating Chicago police officers' disdain and animus for protestors.

65.     CPD's violence and brutality against protestors is consistent with the department's widespread policy and practice of using aggressive tactics that escalate encounters with individuals, increase tensions, and lead to excessive force. CPD's violence against protestors is an extension of CPD's long-standing, widespread practice of excessive force. This policy has been documented in the Chicago Police Accountability Task Force, the federal courts, as well as by civil

rights leaders, City officials, and individuals targeted by CPD for violence and abuse.

66.     In April 2016, the Task Force released a report about the system of training, accountability, and oversight of officers. In summary, the report noted that the community's lack of trust in CPD is justified. There is substantial evidence that people of color have had disproportionately negative experiences with the police over an extended period of time. There is also substantial evidence that these experiences continue today with the use of force, foot and traffic stops and bias.

67.     In January 2017, the DOJ released a report related to the pattern and practice of unlawful conduct by officers. The report concluded that CPD officers engage in a pattern and practice of using force that is unjustified, disproportionate, and otherwise excessive. Further, officers use unnecessary and unreasonable force in violation of the Constitution with frequency, and that unconstitutional force has been historically tolerated by CPD.  The CPD's pattern and practice of unreasonable force also includes the unnecessary, unjustified use of excessive, less-than-lethal force, including Tasers, batons, emergency takedowns, body slamming, and hand-to-hand combat. The use of unreasonable force to resolve non-violent encounters is a recurrent issue within CPD. As a matter of pattern and practice, CPD uses overly aggressive tactics that unnecessarily escalate encounters with individuals, increase tensions, and lead to excessive force. The CPD fails to de-escalate encounters when it would be reasonable to do so.

68.     The CPD has disregarded recent consent decree requirements. The City's non-compliance and missed deadlines bear directly on CPD's civil rights abuses at the Summer 2020 protests. CPD failed to create adequate policies and procedures for use of force, impartial policing, and crisis intervention and failed to revise relevant use of force and accountability policies.

69.     The CPD has fostered a widespread code of silence and failure to discipline abusive officers. The CPD has maintained its widespread practice of excessive force for years through promoting the "code of silence" and the failure to discipline officers. Any officer who violates this code is penalized by the CPD. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens. This includes Defendant officers in this case.

70.     In *Obrycka v City of Chicago, et al.*, No. 07-cv-2372 (N.D. Ill.), a federal jury found that, as of February 2007, the City of Chicago "had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

71.     Although a number of the Consent Decree provisions are designed to eliminate the code of silence, CPD has failed to comply with these terms. For instance, CPD failed to implement a policy to ensure officers who report misconduct receive protection.

72.     The CPD's failures relate directly to the excessive force in this case. As a matter of both policy and practice, municipal policy makers and department

18

supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case. As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendant officers here) have come to believe that they may violate the civil rights of members of the public.

### Count I – 42 U.S.C. § 1983
### Excessive Force

73.     Plaintiff realleges each of the foregoing paragraphs as if fully stated herein.

74.     As described in the preceding paragraphs, the conduct of Defendants, acting under color of law and within the scope of their employment, constituted violations of the Fourth Amendment to the United States Constitution.

75.     The conduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

76.     As a direct and proximate result of the City of Chicago and Defendants intentionally, knowingly, unlawfully and unconscionably acting in the manner

aforesaid, Plaintiff has and will suffer lost wages, benefits, and entitlements, damage to his career and reputation, pain, suffering, and humiliation and severe emotional distress and has been deprived of certain rights and privileges as a citizen of the United States, in violation of 42 U.S.C. §1983.

### Count II – 42 U.S.C. § 1983
### Illegal Detention

77.     Plaintiff realleges each of the foregoing paragraphs as if fully stated herein.

78.     As described in the preceding paragraphs, the conduct of Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, detained Plaintiff, accused him of criminal activity, and instituted and continued proceedings against Plaintiff without probable cause.

79.     In so doing, Defendants caused Plaintiff to be detained without probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments.

80.     The proceedings against Plaintiff were dismissed and terminated in his favor.

81.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

82.     As a direct and proximate result of the City of Chicago and Defendants

intentionally, knowingly, unlawfully and unconscionably acting in the manner aforesaid, Plaintiff has and will suffer loss of liberty, great mental anguish, lost wages, benefits, and entitlements, damage to his career and reputation, pain, suffering, degradation, humiliation, and has been deprived of certain rights and privileges as a citizen of the United States, in violation of 42 U.S.C. §1983.

**Count III – 42 U.S.C. § 1983**
**Failure to Intervene**

83.     Plaintiff realleges each of the forgoing paragraphs as if fully stated herein.

84.     Certain unidentified Chicago Police officers did not participate in the attack, but they, acting under the color of law and within the scope of their employment, stood by and failed to intervene.

85.     By reason of the unidentified officers' conduct, Plaintiff was deprived of his rights, privileges, and immunities secured to him by the Constitution of the United States and laws enacted thereunder.

86.     As a direct and proximate result of the City of Chicago and Defendants intentionally, knowingly, unlawfully, and unconscionably acting in the manner aforesaid, Plaintiff has and will suffer lost wages, benefits, and entitlements, damage to his career and reputation, pain, suffering, and humiliation and severe emotional distress and has been deprived of certain rights and privileges as a citizen of the United States, in violation of 42 U.S.C. §1983.

## Count IV – 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

87.     Plaintiff realleges each of the forgoing paragraphs as if fully stated herein.

88.     Each Defendant officer, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

89.     In furtherance of this conspiracy, each of the Defendant officers committed specific overt acts, misusing their police powers to violate Plaintiff's rights. They accomplished this goal by using excessive force on Plaintiff and unlawfully violating his rights.

90.     Each individual Defendant officer is therefore liable for violating Plaintiff's rights by any other individual Defendant officer.

91.     As a direct and proximate result of the City of Chicago and Defendants intentionally, knowingly, unlawfully, and unconscionably acting in the manner aforesaid, Plaintiff has and will suffer lost wages, benefits, and entitlements, damage to his career and reputation, pain, suffering, and humiliation and severe emotional distress and has been deprived of certain rights and privileges as a citizen of the United States, in violation of 42 U.S.C. §1983.

## Count V – 42 U.S.C. § 1983
## Policy Claim (Defendant City of Chicago)

92.     Plaintiff realleges each of the forgoing paragraphs as if fully stated herein.

93.     The misconduct of Defendant officers alleged above was undertaken pursuant to the policy and practice of Defendant City of Chicago. The City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

94.     At all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice by officers and agents of CPD and the City of Chicago of using excessive force against individuals, as well as covering up or providing false justification for the use of force. Further, the City had notice of a widespread practice by officers and agents of CPD and the City of Chicago in instigating false criminal charges in an effort to create narratives to justify the use of force by CPD officers, often in situations where the use of force was unjustified.  The City also had notice of a widespread practice by officers and agents of the CPD and the City of Chicago of falsely arresting protestors, journalists, and legal observers in a manner which chilled First Amendment free expression.

95.     As a matter of both policy and practice, Defendant City encourages the type of police misconduct at issue in this case by failing to supervise, train, investigate, and/or discipline Chicago police officers, and these failures constitute deliberate indifference. These widespread practices, individually and together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very

type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff. The widespread practices and customs were able to exist and thrive because the policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

96. The following of Defendant City's policies and persistent widespread customs and practices were the driving force behind Defendant officers' misconduct and caused harm to Plaintiff:

    a. As a matter of both policy and practice, the Chicago Police Department directly encourages, and is thereby the moving force behind, the very type of conduct at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference;

    b. As a matter of both policy and practice, the Chicago Police Department facilitates the very type of conduct at issue here by failing to punish and discipline prior instances of similar misconduct adequately, thereby leading Chicago Police Officers to believe that their actions will never be scrutinized and, in that way, directly encouraging future abuses such as those affecting Plaintiff;

c. Generally, as a matter of widespread practice, so prevalent as to comprise municipal policy, Chicago Police Department officers abuse citizens in a manner similar to that alleged by Plaintiff, yet the Chicago Police Department makes findings of wrongdoing only in a disproportionately small number of cases;

d. City policymakers were deliberately indifferent to the series of bad acts by Chicago Police Officers from which it can be inferred that the City policymakers were bound to have noticed what was going on, and yet they failed to act, thereby encouraging or at least condoning (in either event, adopting) the misconduct of Defendants;

e. During the relevant time, the Chicago Police Department had one or more of the following: (1) a custom of chastising officers who violate the code of silence; or (2) a custom of failing to train police officers to not retaliate against officers who violate the code of silence; or (3) a custom of not disciplining police officers who retaliate against officers who violate the code of silence; or (4) a custom of failing to supervise officers engaged in wrongful conduct properly;

f. City policymakers are aware of (and condone and facilitate by their inaction) a code of silence in the Chicago Police

Department, by which officers fail to report misconduct committed by other officers, such as the misconduct at issue in this case;

g. The City of Chicago and the relevant policymakers have failed to act to remedy the patterns of abuse described in the preceding sub-paragraphs, thereby tacitly approving and ratifying the type of misconduct alleged here;

h. The City of Chicago acquiesced in a longstanding practice or custom of failing to discipline officers engaged in illegal conduct from which the unconstitutional code of silence can be inferred;

i. The City of Chicago developed and maintained this widespread *de facto* policy and custom with regard to concealing and/or suppressing officer misconduct (both on-duty and off-duty misconduct), including the use of unlawful force. The concealment and suppression of the existence of misconduct includes, but is not limited to: failure to sufficiently investigate allegations of misconduct, failure to accept complaints from citizens against police officers; failure to promptly record witness statements or preserve evidence, failure to promptly interview suspect officers, failure to properly and sufficiently discipline officers, and failure to

initiate prompt disciplinary procedures related to alleged misconduct; failure to investigate complaints against off-duty officers in the same manner as complaints against citizens;

j.  Using excessive force against protestors without justification, including beating people with batons, punching, kicking, kneeing and stomping protestors, hitting protestors with bikes, and tackling protestors;

k.  Escalating encounters through taunts, slurs, pushes, shoves, and acts that illustrate police animus toward protestors;

l.  Giving protestors no reasonable opportunity to leave areas and/or trapping protestors in enclosed areas;

m. Breaking, stealing, or otherwise disposing of protestors' property;

n.  Failing to intervene to prevent police violence and other forms of misconduct, failing to train officers how to respond to protestors, make arrests at demonstrations, failing to take steps to end the code of silence.

97.     The City of Chicago developed and maintained this widespread *de facto* policy and custom with regard to acts of illegality committed by officers against civilians, which encouraged Defendants to believe that they could deprive Plaintiff of his Constitutional rights with impunity and with the explicit or tacit approval of the City of Chicago.

98.     The City and CPD are aware of the harms suffered by plaintiffs and other protestors as a result of the policies. Although the City and CPD are aware of the history of police misconduct, the parties failed to act despite this knowledge.

99.     The City has implemented, enforced, and encouraged, and sanctioned CPD's policies, practices, and customs alleged above in violation of Plaintiff's and other protestors' rights. The City has acted with deliberate indifference to the rights of Plaintiff. As a direct and proximate result of the acts and omissions of the City and CPD, the rights of Plaintiff have been violated.

100.    These policies, practices, or customs of Defendant City, individually and/or collectively, were the moving force behind Defendant officers' conduct, depriving Plaintiff of his rights under the United States Constitution.

101.    In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policy making authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

102.    Plaintiff's injuries were directly and proximately caused by the officers, agents and employees of the City of Chicago, including but not limited to the individually names Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## Count VI – State Law Claim
### Battery

103.    Plaintiff realleges each of the forgoing paragraphs as if fully stated herein.

104.    As described in the preceding paragraphs, Defendant officers' conduct, acting within the scope of their employment as police officers, constituted unjustified and offensive physical contact, undertaken willfully and wantonly, proximately causing Plaintiff bodily injuries.

105.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

106.    Defendant officers undertook the misconduct described in this Count within the scope of their employment such that their employer, the City of Chicago, is liable for their actions.

107.    As a direct and proximate result of Defendant officers' acts, Plaintiff was injured, suffering bodily injuries, suffered emotional anxiety, mental trauma, humiliation, fear, stress, pain and suffering, and other damages.

## Count VII – State Law Claim
### Assault

108.    Plaintiff realleges each of the foregoing paragraphs as if fully stated herein.

109.    As described in the preceding paragraphs, the conduct of Defendants, acting within the scope of their employment as police officers, created a reasonable

29

apprehension of imminent harm, undertaken willfully and wantonly, proximately causing Plaintiff emotional and other injuries.

110.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

111.   The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

112.   As a result of Defendants' conduct, Plaintiff had a reasonable apprehension that his life was in danger.

113.   Defendants undertook the misconduct described in this Count within the scope of their employment such that their employer, the City of Chicago, is liable for their actions.

114.   As a direct and proximate result of the Defendant officers' acts, Plaintiff was injured, suffered motional anxiety, mental trauma, humiliation, fear, stress, pain and suffering, and other damages.

## Count VIII – State Law Claim
## Intentional Infliction of Emotional Distress

115.   Plaintiff realleges each of the foregoing paragraphs as if fully stated herein.

116.    The conduct and actions of Defendant officers set forth above were extreme and outrageous. Defendants' actions were rooted in an abuse of power and authority and were done intentionally, willfully, and wantonly, and/or knowing that

there was a high probability that their conduct would cause Plaintiff severe emotional distress.

117.    As a direct and proximate cause of the extreme and outrageous conduct of Defendants, Plaintiff was injured and experienced severe emotional distress constituting intentional infliction of emotional distress under Illinois state law.

## Count IX – State Law Claim
## Civil Conspiracy

118.    Plaintiff realleges each of the foregoing paragraphs as if fully stated herein.

119.    Count IX is alleged against all Defendant officers.

120.    Defendant officers together reached an understanding, engaged in and continue to engage in the course of conduct, and otherwise jointly acted and/or conspired among themselves to violate Plaintiff's rights guaranteed by the Illinois constitution.

121.    In furtherance of this conspiracy, Defendant officers, together with their known and unknown co-conspirators, committed the overt acts set forth above.

122.    Defendant officers acted with malice, willfulness, and reckless indifference to Plaintiff's rights.

123.    Each individual Defendant is therefore liable for violating Plaintiff's rights by any other individual Defendant.

124.    The conspiracy was and is continuing in nature.

125.   As a direct and proximate result of the Defendant officers' conspiracy, Plaintiff suffered damages, including mental distress, anguish, humiliation, violation of his rights as set forth more fully above.

## Count X – State Law Claim
### False Arrest

126.  Plaintiff realleges each of the foregoing paragraphs as if fully stated herein.

127.  As more fully alleged above, Defendants unlawfully detained, arrested, and imprisoned Plaintiff, or caused him to be unlawfully detained, without legal justification to do so.

128. Defendants acted willfully and wantonly in that they intended to violate, or were recklessly indifferent towards violating Plaintiff's rights.

129.  As a direct and proximate result of the Defendant officers' conduct, Plaintiff suffered damages, including mental distress, anguish, humiliation, violation of his rights as set forth more fully above.

## Count XI – State Law Claim
### Conversion

130.  Plaintiff realleges each of the foregoing paragraphs as if fully stated herein.

131.  Defendants by use of force, assumed control of Plaintiff's backpack, necklace, and cellphone.

132.  Defendants' assumption of control over Plaintiff's possessions was unauthorized and wrong.

133. Plaintiff has the right to control and retain possession of his property, but Defendants have deprived him of his personal property without his consent.

## Count XII – State Law Claim
## Malicious Prosecution

134. Plaintiff realleges each of foregoing paragraphs as if fully stated herein.

135. Defendants individually, jointly and/or in conspiracy, initiated and continued a malicious prosecution without probable cause against Plaintiff.

136. The prosecution of Plaintiff terminated in his favor and in a manner that is indicative of innocence.

137. Defendants' actions were committed in a willful and wanton manner.

138. As a direct and proximate result of the Defendant officers' conduct, Plaintiff suffered damages, including mental distress, anguish, humiliation, violation of his rights as set forth more fully above.

## Count XIII – State Law Claim
## Respondeat Superior

139. Plaintiff realleges each of foregoing paragraphs as if fully stated herein.

140. Count XIII is alleged against Defendant City of Chicago.

141. In committing the acts alleged in this Complaint, each of the individual Defendant officers were members of, and agents of, the Chicago Police Department, acting at all relevant times within the scope of their employment.

142. Defendant City of Chicago is liable as principal for all torts in violation of state law committed by its agents.

## Count XIV – State Law Claim
## Indemnification

143. Plaintiff realleges each of the foregoing paragraphs as if fully stated herein.

144. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

145. Defendant officers are or were employees of the Chicago Police Department, who acted within their employment scope in committing the misconduct described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, JOHN FIX, respectfully requests that this Court enter judgment in his favor and against Defendants, CITY OF CHICAGO, Former Chicago Police Officer MICHAEL SEISER, Chicago Police Officers REGINALD FOSTER, BOJAN SIMIC, RICHARD BANKUS, BRANDON NEITA-SCOTT, SERGEANT SHANNON MARTIN, and Unknown Chicago Police Officers, awarding compensatory damages, costs, attorneys' fees, along with punitive damages against each of the individual Defendants, as well as injunctive and declaratory relief, and any other relief available under the law.

## JURY DEMAND

Plaintiff, JOHN FIX, hereby demands a trial by jury pursuant to the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

JOHN FIX

/s/ Steven H. Fine

Steven H. Fine
LAW OFFICES OF STEVEN H. FINE
53 W. Jackson Blvd., Ste. 1215
Chicago, IL 60604
(312) 922-0855
steve@sfinelaw.com

/s/ Jonathan M. Brayman

Jonathan M. Brayman
BREEN & PUGH
53 W. Jackson Blvd., Ste. 1215
Chicago, IL 60604
(312) 360-1001
jbrayman@breenpughlaw.com